IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LORI V. BROWN,

            Plaintiff,

v.

GREEN COUNTY,

            Defendant.

OPINION and ORDER

20-cv-1100-slc

In this civil action brought under the Federal Family and Medical Leave Act (FMLA), 29 U.S.C. § 2611, et seq., and Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101, et seq., plaintiff Lori Brown alleges that defendant Green County retaliated against her for exercising her rights under the FMLA and discriminated against her based on her association with an individual with a disability (her husband), by failing to promote her to the position of Fiscal Supervisor in the summer of 2019. Now before the court is Green County's motion for summary judgment. Dkt. 14.

For the reasons explained below, I conclude that Brown has adduced evidence that, if credited, is minimally sufficient to defeat the county's motion for summary judgment.

The following facts are undisputed except where noted:

## UNDISPUTED FACTS

**I. The Parties and Background**

Plaintiff Lori Brown has been employed by defendant Green County as the Business Manager of the Department of Human Services since August 1997. She reports directly to the Director of Human Services and supervises a file clerk and a receptionist. As the Business Manager, Brown has many responsibilities, including: financial reporting to public and private

agencies; assisting with the budget process by developing, maintaining, and closing year-end books to ensure compliance with budget guidelines; tracking, reviewing, reconciling, and correcting discrepancies with the books; gathering and creating needed documentation for financial audits; meeting with auditors; vendor relations, including sourcing, quoting, reviewing, and monitoring contracts between vendors and the county; management of support staff; overseeing hiring, training, and scheduling; and coordinating with other internal departments as issues arise. At the time of her hire in 1997, Brown was performing the duties of both the Business Manager and Fiscal Supervisor because the Fiscal Supervisor position did not exist until 1998.

At some point, Julie Sachs became the Fiscal Supervisor for the department. In 2015, Sachs was promoted to Finance Director, and Brown applied for the vacant Fiscal Supervisor position. Brown was granted an interview with Human Services Director Greg Holcomb, Sachs, and two human services board members, but she was not hired for the position. The county hired Andrea Sweeney, who began working as the Fiscal Supervisor on March 30, 2015.

Brown viewed her working relationship with Sweeney as strained, in part because she believed that Sweeney overextending herself in her position. In addition to Sweeney's work demands, Brown believed there was additional strain on her working relationship with Sweeney after Brown reported Sweeney to the human resources department for over-reporting meal expenses during work-related training conferences in May 2017 and May 2018. Because Sweeney is an individual with a disability and her disability (diabetes) necessitated additional food expenses during the work-related training conferences, the county did not discipline her.

## II. Brown's FMLA Leave

Brown's husband, Jeffery Brown, suffers from multifocal motor neuropathy, which causes weakness, fatigue, and an inability to perform activities of daily living. In June 2018, Brown requested and the county approved intermittent FMLA leave for Brown to care for her husband. Brown told Sweeney about her husband's diagnosis and informed Sweeney that she would need to take some time off of work. Between June 2018 and June 2019, Brown took 27.9 hours of FMLA leave for this purpose. Brown reapplied for FMLA leave on or about September 4, 2019.

At some point in 2019, Brown saw a typed document with a few handwritten notes that listed the days that Brown had taken off of work.[1] *See* dkt. 27-1. Shianne Broughton in the HR department, and not Sweeney, was responsible for tracking FMLA absences at that time. Brown spoke to Human Services Director Holcomb and HR Director Clint Langreck about the document shortly after finding it, but neither knew anything about it.

Daniel Williams became Green County's Director of Human Services in May 2019. Around this time, Brown told Williams that she had been on intermittent FMLA due to her husband's illness. She also told him about the document that she had found after he told her that Sweeney wanted to make some changes to the county's FMLA implementation.

---

[1] The parties dispute the source of the handwriting that appears on the document: Brown alleges that the handwriting was Sweeney's, but Sweeney denies keeping written notes or otherwise tracking the time that Brown was out of the office. If relevant, this issue will have to be resolved by the jury at trial. In addition, the county opposes the admission of the document on the ground that Brown did not produce it during discovery. It is not necessary for the court to resolve this issue on summary judgment but it will do so prior to trial if the county files a motion *in limine*.

### III. 2019 Fiscal Supervisor Hiring

In or around June 2019, Sweeney applied for and was promoted to the position of Finance Director, leaving the Fiscal Supervisor position vacant. The position opening was posted for potential applicants on July 2, 2019, and candidates sent their applications directly to Williams for his review. Although Williams was responsible for the interview and recruitment process and for making the final hiring decision, Sweeney and Amber Russell sat on the interview panel and provided feedback that Williams considered. Williams asked Sweeney to participate in the interviews because she knew what the position entailed and what skills and education would make someone successful in the position. Williams believed that Russell, as the county's Aging and Disability Resource Center supervisor, would work closely with the successful candidate. It was important to Williams that the candidate have a positive working relationship with the other human services supervisors.

#### A. Brown's Conversation with Sweeney About The Position

Around July 9, 2019, Brown asked Sweeney if there was anything about the Fiscal Supervisor position that would prevent Brown from doing the job. Sweeney has a daughter with a disability and had needed to take time off in the past to care for her. During the conversation, Sweeney was the first one to bring up Brown's husband, making a statement to the effect of: "Your husband is sick and you would have to take time off to take care of him. You don't want this job. It's too stressful. You wouldn't be able to do it."[2] Brown understood Sweeney to be

---

[2] Sweeney says that as an individual with an immediate family member with a disability, she felt that the Fiscal Supervisor position could be difficult when managing personal versus work obligations and that she was giving Brown her personal opinion, on a peer level. Brown says that Sweeney did not discuss managing personal versus work obligations. In any event, for purposes of summary judgment, Green County accepts Brown's characterization of the conversation with Sweeney.

4

telling her that she could not perform the Fiscal Supervisor position due to her husband's disability, that she should not apply for the position, and that she would not be hired if she did apply.

Brown told Williams that she had asked Sweeney about the position and that Sweeney told her that the position would be hard and too stressful due to her husband's illness. After his conversation with Brown, Williams was under the impression that Sweeney had told Brown that her use of FMLA leave would be factored into the hiring decision. Williams had concerns about this conversation because he was aware that Brown's use of FMLA leave was not something that the county would consider. He told Brown that her leave and her husband's condition would not and could not be considered or used against her in making the Fiscal Supervisor hiring decision and that she should apply for the position if she was interested.

Williams then spoke with Sweeney about her comments to Brown, and Sweeney confirmed that she had brought up Brown's husband's illness during their conversation. Sweeney told Williams that Brown had asked her if she should apply for the Fiscal Supervisor position and that Sweeney had told her "yes." Sweeney then told Williams that she had spoken to Brown "on a peer level," explained that the Fiscal Supervisor position had significant time commitments and was more stressful than the Business Manager position, and that if Brown was comfortable with those commitments, considering her husband's condition, then she should apply.[3] Williams did not consider removing Sweeney from the hiring committee or creating any kind of process to ensure that Sweeney didn't take Brown's husband's illness into account when Sweeney provided her recommendation of who to hire.

---

[3] Brown does not dispute that Sweeney made these comments to Williams, but she contends that Sweeney did not represent her conversation with Brown accurately.

5

**B. Interviews and Selection of Candidate**

On July 12, 2019, Brown applied for the Fiscal Supervisor position and listed Sweeney as a reference on her application. Williams and Sweeney reviewed the applications and selected four candidates to interview, including Brown. Interviews were held from July 26 to July 29, 2019. At the end of each interview, Williams, Russell, and Sweeney discussed their initial reactions to the interview and the candidate's strengths and weaknesses.

Brown's interview took place on July 29. After the formal questions had been asked, the interviewers asked Brown if she had any additional information she wished to provide. In response, Brown stated that she was aware of the time commitment involved in the position and did not have any concerns about her husband's illness affecting her ability to do the job. Brown asked that they not consider her husband's disability or her use of FMLA leave in their hiring decision. Williams understood Brown's comments about her husband's illness to be a reaction to the comments that Sweeney had made to her about the position during their earlier conversation. After Brown's interview, the interviewers discussed their surprise that Brown had made comments about her FMLA leave.

After Brown's interview, Sweeney raised concerns to the other interviewers about the accuracy of a statement that Brown had made about successfully correcting an error in a state report that had resulted in a large sum of money not being paid to the county. Sweeney believed that the prior Fiscal Supervisor, and not Brown, had fixed the error.

According to Brown, she had told Sweeney about a situation in which the county lost a large sum of money to emphasize the importance of keeping up with training in the Fiscal Supervisor position. Sachs (the prior Fiscal Supervisor) did not check to see if funding came in

until August, at which time it was too late to make a correct report. After Sachs brought this to Brown's attention, Brown called one of her contacts with the state and explained what happened. The state employee spoke with her superior and said the state would pay the county but wanted to meet with the county to discuss the importance of attending trainings and timely reviewing funding. Brown does not know whether Sachs also spoke with the state regarding this situation.

Brown believes that Sweeney raised the issue regarding the error as a pretext to cover her true objection to Brown's candidacy, which was Brown's husband's disability. Williams believed Sweeney's statements about Brown's interview response and did not look into the accuracy of Brown's statements. Williams does not know whether Sweeney's critical comments about Brown after the interview were a cover for her feelings about Brown's husband's illness.

After the initial four interviews, Williams was not thrilled about any of the candidates for the position. Sweeney and Russell did not recommend a particular candidate to hire. On August 6, 2019, Williams sent a rejection letter to one candidate (not Brown) whom he considered the least qualified applicant.

Williams had no concerns with Brown's attendance or availability to perform the Fiscal Supervisor position, or her need to take time off to care for her husband. The fact that Brown took FMLA leave was not something that stuck out in Williams's memory. However, he was concerned that Brown did not have what it would take to bring the human services supervisors together to work collaboratively, which was his goal when he took over as the Director of Human Services.

Williams believed that Brown had not been forthcoming during her interview about an ongoing conflict between her two direct-report employees. Brown had reached out to Williams and upper management regarding these issues. However, during her interview, Brown stated that she would not have issues dealing with subordinates because she had been doing so for many years and had always been able to successfully resolve any issues. According to Brown, she occasionally conferred with Williams about staff conflicts when necessary. She did not ask upper management actually to resolve conflicts between her direct-reports, but rather went to them for approval or assistance when she felt it was appropriate. Brown also resolved many minor staff conflicts herself without relying on management.

On August 5, 2019, Teresa Withee applied for the fiscal supervisor position. Withee is Sweeney's husband's cousin and is married to a county board member. Williams, Sweeney, and Russell interviewed Withee on August 9, 2019, but Sweeney withheld her feedback after the interview to avoid a conflict of interest. Williams believed that Withee was the most qualified candidate for the position, and all of the interviewers were leaning toward Withee.

Williams made the decision to hire Withee for the position after he checked her references on August 12 and 13, 2019. Apart from a brief discussion with Sweeney and Russell immediately following each interview, Williams did not consult with anyone in making the final hiring decision for the Fiscal Supervisor position. Williams believed Withee had the most relevant experience for the Fiscal Supervisor position because in her former position as clerk treasurer for the City of Brodhead, she presented, created, and monitored budgets for multiple departments for the city, which gave her an understanding of different funding sources and different program requirements, and she performed state and grant reporting. Although

8

Williams thought that Brown and Withee had similar experience, he did not believe that Brown had any experience presenting or creating budgets, or as much experience as Withee in monitoring budgets. Williams believed that out of all of the candidates, Withee had the most experience and would be a good asset to the agency. Therefore, on August 15, 2019, Williams advised Brown in person and sent letters to the remaining candidates that they had not been selected for the position.

## ANALYSIS

### I. Legal Standards

#### A. Summary Judgment

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To avoid summary judgment, Brown must "produce sufficient admissible evidence, taken in the light most favorable to [her], to return a jury verdict in [her] favor." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012); *see also Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (non-moving party must provide evidence on which jury could reasonably find for nonmoving party to survive summary judgment).

### B. The ADA

An employer is prohibited from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); *see also* 29 C.F.R. § 1630.8. An employer is not required to provide a reasonable accommodation to a non-disabled worker to care for another person with a disability. *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012) (citing *Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004); 29 C.F.R. Pt. 1630, App. (§ 1630.8)). However, even though "an employer does not have to accommodate an employee because of her association with a disabled person, the employer cannot [adversely treat] the employee for unfounded assumptions about the need to care for a disabled person." *Id.* at 337.

Brown must present evidence that the county's failure to hire her was based on discriminatory intent. *Magnus*, 688 F.3d at 338. To this end, the Seventh Circuit has endorsed a modified *McDonnell Douglas* burden-shifting framework for ADA association claims, under which a plaintiff must establish that: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by the county at the time to be related to someone with a disability; and (4) her case falls into one of the three relevant categories: expense, disability by association, or distraction. *Id.* at 336-37; *Larimer*, 370 F.3d at 701-02. In this case, Brown claims that even though she was qualified for the Fiscal Manager position, the county failed to promote her because it believed that she would be too distracted by her husband's disability to fulfill the responsibilities of the job. *See Larimer*, 370 F.3d at 700 (In the distraction category, the employee is treated adversely because

10

"the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation."). After making a prima facie case, "the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (internal citation omitted).

As with other employment discrimination cases, in ADA cases "the modified *McDonnell Douglas* test and the direct [evidence] method can often be analyzed together because both approaches require the plaintiff to present evidence indicating it is more likely than not the employer took the adverse action *because of* the plaintiff's . . . association with a disabled individual." *Magnus*, 688 F.3d at 737 (internal quotation omitted and emphasis added); *see also Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (The legal standard in employment discrimination cases "is simply whether the evidence would permit a reasonable factfinder to conclude that the . . . proscribed factor caused the discharge or other adverse employment action."); *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 952 (7th Cir. 2008) (Posner, J., concurring) (plaintiff must demonstrate that "adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision") (emphasis added); *Williams v. Brennan*, 2019 WL 5260783, at *12 (N.D. Ill. Oct. 16, 2019) (quoting same). The Seventh Circuit has interpreted the ADA's "because of" language to require "but for" causation, meaning that the decision-maker would not have taken the adverse action "but for" the employee's protected classification. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020).

Although Brown cites the modified *McDonnell Douglas* framework, she recognizes that what matters at summary judgment is whether she has presented enough evidence to allow the jury to find in her favor. *See Igasaki*, 988 F.3d at 957-58 (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)).

### C. The FMLA

The FMLA "provides eligible employees the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period because of a serious health condition, including the serious health condition of a family member," and it "affords employees protection in the event that they are retaliated against because of their choice to exercise their rights under the Act." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) (citing 29 U.S.C. § 2615(a)). "Retaliation claims under the FMLA . . . require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). To succeed on her retaliation claim, Brown need not prove that "retaliation was the *only* reason for [the hiring decision]; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor'" in the county's decision not to hire her as the fiscal manager in 2019. *Lewis*, 523 F.3d at 741-742 (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)); *see also Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (asking whether record contains sufficient evidence to permit reasonable factfinder to conclude that employer fired plaintiff in retaliation for taking FMLA leave). "A retaliation claim requires proof of

discriminatory or retaliatory intent, which can be established directly or indirectly." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012) (citing *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)); *see also Gonzalez v. JBS Live Pork, LLC*, 2022 WL 358158, at *7 (C.D. Ill. Feb. 7, 2022) (noting long history of binding precedent requiring proof of intent); *Goad v. Milwaukee Cty.*, 2018 WL 1440338, at *7 (E.D. Wis. Mar. 21, 2018) (quoting same).

## II. Evidence of Discrimination and Retaliation

The County contends that there is no evidence that Williams considered Brown's husband's alleged disability or Brown's FMLA leave in making his hiring decision for the Fiscal Supervisor position in 2019. Rather, argues the County, Williams selected Withee over Brown and the other candidates because Withee had the most applicable experience for the position and would be a good asset to the agency. As the clerk treasurer for the City of Brodhead, Withee presented, created, and monitored budgets for multiple city departments, which gave her an understanding of different funding sources and different program requirements, and she performed state and grant reporting. On the other hand, Williams believed that Brown did not have any experience in presenting or creating budgets and did not have as much experience as Withee in monitoring budgets. In fact, Brown previously had been passed over for this exact position prior to her husband's diagnosis and her FMLA leave. In addition, Williams stated that he had concerns about Brown's ability to work collaboratively with her colleagues and believed that she was not forthcoming during her interview about an ongoing conflict between her two direct reports.

As Brown points out, however, the concern "in reviewing an employer's reasons for termination is the honesty of the employer's beliefs." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (citing *Balderston v. Fairbanks Morse Engine Division*, 328 F.3d 309, 323 (7th Cir. 2003)). To show that an employer's beliefs are not credible, a plaintiff must present evidence that she was not hired for reasons other than those provided, that the reasons had no grounding in fact, or that the reasons were insufficient to warrant the hiring decision. *Castetter*, 953 F.3d at 997 (citing *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009)). Brown argues that Williams's stated rationale for not hiring her is pretextual because she had performed or was performing all of the essential functions of the Fiscal Supervisor position, and any limited disagreements that she may have had with subordinates over a short period of time do not overshadow her 22-year career. Brown contends that, at the very least, Williams's alleged concerns about her qualifications and interview responses present a triable issue of fact, making summary judgment improper. Brown raises a fair point, but it only goes so far.

Brown also must show that she was not hired because of her association with her husband (ADA claim) and in retaliation for taking FMLA leave (FMLA claim). "Specifically, she ha[s] to 'provide direct or circumstantial evidence that the decisionmaker has acted for a prohibited reason.'" *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011); *see also Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 722 (7th Cir. 2018) (comments by non-decisionmakers are not evidence of discriminatory intent). Although Sweeney participated in the interview process and provided feedback regarding the candidates for the Fiscal Supervisor position, it is undisputed that Williams made the final hiring decision.

14

The evidence in this case does not support a conclusion that Williams personally harbored any illegal animus toward Brown. It is undisputed that Williams had no concerns over Brown's attendance, availability to perform the Fiscal Supervisor position, need to care for her husband, or absences related to her husband's condition. Brown also admits that Williams told her that her husband's condition and her FMLA leave would not and could not be considered in making the Fiscal Supervisor hiring decision, and that she should apply for the position if she was interested in it.

Instead, Brown contends that *Sweeney's* comments about Brown's need to use FMLA leave to care for her husband provide evidence of discriminatory and retaliatory animus. Specifically, she argues that Sweeney was "animated by an illegal employment criterion" when, in her capacity as a member of the hiring committee, Sweeney recommended the denial of Brown's application for the Fiscal Supervisor position—a recommendation that Williams considered in reaching the determination. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (discussing comments made by managerial employee). The county dismisses Sweeney's comments as stray remarks by a non-decisionmaker who was speaking as a peer in the same protected category as Brown—the family member of a person with a disability. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (temporal distance between comments and termination decision and lack of any connection to termination decision call evidentiary value of comments into question).

Considering Brown's version of events in the most favorable light to her, I conclude that a reasonable jury could conclude that Sweeney herself harbored an illegal animus or bias.[4] *See Ziccarelli v. Dart*, ___ F.4th ___, 2022 WL 1768844, at *2 n.2 (7th Cir., June 1, 2022) ("We emphasize, however, that because the defendants chose to move for summary judgment, we must discount [their FMLA manager's] testimony and credit plaintiff's on these disputed factual issues."). In addition to evidencing bias on their face, Sweeney's alleged remarks were both proximate and directly linked to the Fiscal Supervisor hiring decision. *See Castetter*, 953 F.3d at 997 ("[I]solated comments must be contemporaneous with termination or causally related to the" adverse action.); *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (internal citation omitted) ("A remark can raise an inference of discrimination when it was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action."); *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) ("[I]solated, stray workplace remarks that are not clearly linked to the [adverse decision] . . . cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question.").

Even so, the county is correct that Brown cannot prevail without demonstrating some causal connection between Sweeney's alleged bias and Williams's decision not to hire Brown as the Fiscal Supervisor. *Schandelmeier-Bartels*, 634 F.3d at 379; *Howe v. Sears, Roebuck & Co.*, 990

---

[4] Citing Brown's ambiguous deposition testimony, the county argues that Brown believed that the true reason Sweeney made the comment to Brown was because Sweeney was still angry with Brown for reporting Sweeney to HR in 2017 and 2018. *See* dkt. 23 at 83. However, Brown's testimony does not clearly support the county's contention or significantly tip the scale in the county's favor. Accordingly, it will be up to the jury to determine Sweeney's intent. *See Ziccarelli*, 2022 WL 1768844, at *3 ("Even if a judge might believe a moving party has more and/or better evidence in its favor, a motion for summary judgment does not authorize or invite the judge to weigh evidence and decide whose story is more credible or persuasive.").

F. Supp. 2d 913, 923 (W.D. Wis. 2014) (plaintiff must show that non-decisionmaker influenced adverse employment decision through recommendation, supply of information, or other similar act and did so because of illegal bias).

To bridge this causation gap, Brown relies on a theory of liability known as the "cat's paw doctrine,"[5] in which courts impute the discriminatory or retaliatory intent of a subordinate to an employer in situations where the subordinate exerts significant influence over the employment decision." *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009); *see also Schandelmeier-Bartels,* 634 F.3d at 379 (Jury may infer that "another employee's impermissible bias infected a decision" only if "plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision.") "The classic cat's paw case occurs when an 'unwitting manager or supervisor . . . is persuaded to act based on another's illegal bias.'" *Morris v. BNSF Railway Co.*, 969 F.3d 753, 762-63 (7th Cir. 2020) (quoting S*chandelmeier-Bartels*, 634 F.3d at 379).

Even if a non-decision maker's comments were discriminatory or retaliatory, an employer can avoid liability under a cat's paw theory by showing that the decision maker was not wholly dependent on a single source of information, performed their own independent analysis, and came to their own conclusion. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019); *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452-53 (7th Cir. 2009). However, "[c]ourts have held that even if decision makers used some of their own judgment and

---

[5] "'Cat's paw' is a reference to the 17th Century fable 'The Monkey and the Cat'. The fable tells a story of a monkey who persuades a cat to pull chestnuts from the embers of a fire, only to take the chestnuts and leave the cat nursing a burnt paw." *Brooks v. Avancez*, 2021 WL 1535300, at *9 (N.D. Ind. Apr. 19, 2021) (citing https://en.wikipedia.org/wiki/The_Monkey_and_the_Cat; http://www.read.gov/aesop/076.html).

relied on other resources when making their decision, they are not relieved of liability if the plaintiff can show that they would not have made the same decision had it not been for the information provided by a person with discriminatory animus." *Howe v. Sears, Roebuck & Co.*, 990 F. Supp. 2d 913, 924 (W.D. Wis. 2014) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) ("And it is axiomatic under tort law that the exercise of judgment by the decision maker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm.").

Here, it is undisputed that Sweeney participated in the interviews and provided feedback to Williams, which he considered. Although Sweeney withheld her final candidate recommendation until after Williams expressed his belief that Withee was the most qualified applicant for the position, she raised concerns during the interview process about Brown having mischaracterized her role in correcting a financial error. It is undisputed that Williams believed Sweeney's statements about Brown's interview response and did not look into the accuracy of Brown's statements. Williams also admitted that he did not know whether Sweeney's critical comments about Brown were a cover for her feelings about Brown's husband's illness. It is also undisputed that all of the interviewers discussed their reaction to Brown's post-interview comments about her husband's disability and FMLA leave. Even though Williams says that Brown's FMLA leave and Sweeney's feedback did not factor in or play any role in his decision not to select Brown, he testified that he took Sweeney's recommendation to reject Brown's application into account when making his decision on who to hire for the Fiscal Supervisor position. Finally, a reasonable jury could infer that Williams, who had started in his job only

two months before the hiring decision, may have placed greater weight on Sweeney's comments because she had held the position previously.

In sum, I agree with Brown that Williams's stated rationale for not hiring her and the nature of Sweeney's comment and its impact on the hiring process create triable issues of fact that should be resolved by a jury. It is a close question whether Brown can show that Sweeney harbored animosity toward her because of her association with a person with a disability and her use of FMLA leave, and that Sweeney's bias so influenced Williams that he would have promoted Brown in the absence of Sweeney's influence. However, Brown has cited evidence that would be minimally sufficient to allow a reasonable jury to find in her favor. Therefore, I will deny the county's motion for summary judgment.

## ORDER

IT IS ORDERED that defendant Green County's motion for summary judgment (dkt. 14) is DENIED.

Entered this 6th day of June, 2022.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge